IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**SHREE HARI, LLC d/b/a ECONOLODGE**  **PLAINTIFFS**
**and RASIKLAL PATEL**
**V.**  CAUSE NO. 3:23-cv-348-HTW-LGI_____

**ACCELERANT SPECIALTY INSURANCE**
**COMPANY; and NORTH AMERICAN RISK**
**SERVICES, INC.**  **DEFENDANTS**

**COMPLAINT**
[Trial by Jury Requested]

**COMES NOW**, the plaintiff, Shree Hari, Inc. d/b/a Econolodge, by and through counsel of record and brings this complaint for damages against the defendants as follows:

**PARTIES**

1. Plaintiff, Shree Hari, LLC. d/b/a Econolodge ("Econolodge"), is a Mississippi limited liability company with a principal office address and physical location of 1600 Jerry Clower Boulevard, Yazoo City, Mississippi 39194-2715.

2. Plaintiff, Rasiklal Patel, is the owner and manager of the Econolodge. Mr. Patel lives at the Econolodge at 1600 Jerry Clower Boulevard, Yazoo City, Mississippi 39194-2715.

3. Defendant, Accelerant Specialty Insurance Company ("ASIC"), is a foreign insurance company that is not licensed with the Mississippi Department of Insurance. ASIC has a home office address of 425 West Capitol Avenue, Suite 1800, Little Rock, Arkansas 72201 and a mailing address of 400 North Ridge Road, Suite 800, Sandy Springs, Georgia 30350. The NAIC identification number for ASIC is 16890. ASIC is not listed with the Mississippi Secretary of State's Office. Defendant, ASIC, is an Arkansas corporation and

1

may be served with process upon its registered agent for service of process, Corporation Service Company, 300 Spring Building, Suite 900; 300 South Spring Street, Little Rock, Arkansas 72201.

4. Defendant, North American Risk Services, Inc. ("NARS"), is a Delaware corporation licensed to do business and doing business in Mississippi with a principal office address of 240 East Central Parkway, Suite 4010, Alta Monte Springs, Florida 32701. Defendant, NARS, may be served with process upon its registered agent for service of process, Corporation Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi 39110.

## JURISDICTION AND VENUE

5. Shree Hari, LLC is a Mississippi limited liability company doing business as the Econolodge in Yazoo City, Yazoo County, Mississippi ("Econolodge"). Plaintiff Rasiklal Patel is a citizen of Yazoo County, Mississippi ("Rasik"). The defendant corporations ASIC and NARS are foreign corporations that are citizens of Arkansas, Delaware or Florida. Defendant, ASIC is not licensed in Mississippi but is an underwriter of surplus line insurance policies in Mississippi, including the policy at issue in this case. Defendant, NARS is registered to do business and doing business in Mississippi. In addition, the relevant insured property is located within the Northern Division of the Southern District of the Mississippi United States District Court and all relevant acts and omissions have likewise occurred in Yazoo County, Mississippi. The amount in controversy, exclusive of interest and costs, exceeds the amount specified by 28 U.S.C. §1332 for application of

diversity jurisdiction. This civil action therefore involves a dispute and controversy properly within the jurisdiction of the United States District Court on diversity of citizenship 28 U.S.C. §1332.

6. Venue is proper in the United States District Court of the Southern District of Mississippi pursuant to 28 U.S.C. §1391(b)(2).

## FACTS

7. The Econolodge is a motel in Yazoo City, Mississippi. Rasik owns and manages the Econolodge.

8. At all relevant times, Econolodge had in place a property and liability insurance policy underwritten by defendant, ASIC. A copy of the policy providing coverage for the period of 12/02/2021-12/02/2022 is attached hereto as Exhibit "A."

9. During either the late hours of July 2, 2022 or the very early morning hours of July 3, 2022, one of the pipes for the property's fire suppression sprinkler system located above the ceiling of the second floor failed.

10. The fire suppression sprinkler system of the property was designed to be a dry system such that the pipes providing water to the sprinkler heads did not remain filled with water on a constant basis. Rather, the system was designed to flood the pipes with water to supply the sprinkler heads only when a sufficient triggering event (fire) was present.

11. Upon information and belief, an air compressor integrated into the property's fire suppression sprinkler system designed to prevent the system from filling with water failed resulting in the fire suppression system becoming inundated with pressurized water.

12. Upon information and belief, on the date and times indicated, pressurized water abruptly escaped through a hole in a section of the pipe located in the ceiling above the second floor hallway which allowed for abrupt liquid overflow to begin.

13. It is unknown exactly when the fire suppression sprinkler system pipe failed but water began being discharged into the attic/over-ceiling area.

14. Upon information and belief, sometime prior to 1:00 a.m. the water above the second floor and on the second floor began making its way "top down" and into rooms occupied by guests. The front desk clerk initially thought that the water complaints were isolated to only a few rooms and was likely due to a plumbing leak.

15. The significant water pressure coming through the hole in the pipe eventually forced a hole through the ceiling of the second floor and pressurized water was then rapidly and abruptly discharged directly onto the second floor hallway.

16. The Econolodge had multiple guests staying in rooms on the first and second floor of what is called the "long hallway" when the abrupt liquid overflow began and guests began complaining and contacting the front desk about water in their rooms around 1:00 a.m. on July 3, 2022.

17. As more and more guests began to complain about water, Rasik was contacted by the front desk clerk and told that water was coming from the second floor. Rasik woke up and started to help move guests from rooms that had water coming in them to unoccupied rooms that were dry. By 2:30 a.m., water was coming down the walls and the first floor

hallway was wet as well. Rasik called the plumbing contractor for the property but was told that, due to the July 4th holiday weekend they did not have an employee available to come to the property. Rasik then attempted to stop the water discharge by closing the main supply valve. Unfortunately, the water supplying the water suppression system was on a different supply line with different shut-off valve location.

18. As more guests began to hurriedly leave their rooms due to the inundation of water, Rasik contacted Mr. Bubba Bradshaw who was familiar with some of the facility systems of the property. Mr. Bradshaw's wife was and remains an employee of the Econolodge.

19. Mr. Bradshaw received the phone call about 3:00 a.m. and advised that he would try to help. Mr. Bradshaw and his family dressed and drove to the Econolodge location. Mr. Bradshaw estimates that he arrived at the property between 3:30 a.m. and 4:00 a.m.

20. Upon arrival, Mr. Bradshaw observed the massive and ongoing discharge of water onto the second floor and running down to the first floor rooms and hallway. Mr. Bradshaw eventually was able to get close enough to the pressurized discharge of water on the second floor to realize that the water was coming from the fire suppression sprinkler system.

21. Approximately 30-40 minutes after arriving on the property, Mr. Bradshaw located the interior shut-off valves for the sprinkler system in the laundry area of the Econolodge and turned off those supply valves.

22. Although the interior supply valves were turned off, the system remained filled with water. Mr. Bradshaw was unable to drain the system because the main supply valve located outside of the building structure was locked. Upon information and belief, the lock on the fire suppression sprinkler system outside supply valve was placed there by the local public works department. Rasik and Mr. Bradshaw attempted to call the local public works department, plumbers and the local fire department to get help turning the main supply off to the fire suppression sprinkler system.

23. Water continued to enter the building until approximately 8:00 a.m. when Mr. Bradshaw ultimately made the decision to cut and remove the lock himself and was able to then shut off the supply valve.

24. An engineer for the defendants has estimated that the pressurized water discharge forced water into the building at a rate of 85-87 gallons per hour. Mr. Bradshaw and other witnesses do not believe that rate of discharge is accurate and believe that far more water was rapidly escaping.

25. Although the precise time the water discharge began is not known, sufficient water had accumulated to enter guest rooms resulting in disturbed sleep and complaints to the front desk by approximately 1:00 a.m. The pressurized discharge of water continued

beyond that point until approximately 4:00 a.m. or 4:30 a.m. when Mr. Bradshaw located and shut off the internal supply valves. Thereafter, water in the system continued to be released at a slower rate until approximately 8:00 a.m. when the main supply valve was unlocked and closed.

26. Mr. Bradshaw estimates that he and his family spent approximately 3 days vacuuming and removing water from the second and first floor hallways and rooms. They tried to save electronics, furniture and other items by removing them from rooms with water and placing them in a dry area.

27. The Econolodge made a claim on the ASIC policy for the property damage to the building structures and associated loss of business income, business property and personal property. The claim was reported to the agent on July 3, 2022.

28. At all relevant times, NARS was the third-party administrator ("TPA") for ASIC. At times, NARS has indicated that it serves as the TPA for "Accelerant Insurance Limited" but it is not disputed that the claim has been adjusted and investigated by NARS. The claim was reported to the defendants by the Econolodge insurance agency on July 5, 2022.

29. Rasik was then contacted by NARS and told that per the duties of the policy, "they should make temporary repairs, mitigate damages to prevent additional unnecessary damages, take photos and not to throw anything away as it is need (sic) to be reviewed for

coverage." The owner was told verbally by the NARS adjuster that, "...he has a duty to mitigate damages."

30. On July 7, 2022, the NARS adjuster confirmed that she did not tell Rasik to use any specific company to perform remediation/stabilization services. She advised that she only told the insured he had a duty to mitigate.

31. On July 9, 2022, the Econolodge made an emergency payment request seeking an "emergency partial good faith advance payment" from the defendants in the hopes of obtaining some emergent funds to help stabilize the property from mold, mildew and other ongoing water-event-related damages as well as replace lost business income. This request was denied.

32. On July 12, 2022, the plaintiffs contracted with Advanced Restoration Technologies, LLC ("ART") to perform mitigation and water damage remediation services. The defendants retained Engle Martin ("EM") to perform loss adjustment and claim management services. On July 12, 2022, EM sent an emergency field claim adjuster, Stuart Chisholm, to the property to evaluate the loss. Mr. Chisholm met with Mr. Gary Martin of ART, Rasik, Mr. Bradshaw, and J.L. Evans and spent several hours inspecting the hallways and affected rooms on the property. Mr. Chisholm then directed ART to mobilize and remove wet mattresses, wet drywall, wet flooring and other items that would contribute to mildew and other related damages. Stuart Chisholm instructed ART to throw damaged and wet items away in roll-off containers that he ordered be mobilized for that purpose. He

instructed the insured and Mr. Martin to wipe down wet furniture and electronics and have them stored for evaluation. Stuart Chisholm stated that he wanted to spend money on removing wet drywall as opposed to spending money to dry out wet drywall that would ultimately have to be torn out anyway. He also stated that the wet air conditioner systems should be pulled out because they would have to be replaced. The remediation activity ordered by EM began immediately.

33. On July 14, 2022, EM reassigned the claim from Stuart Chisholm to Keith Schmelling. However, on July 15, 2022, Stuart Chisholm was discovered (without notice of permission) on the insured property taking pictures in the area above the second floor and taking pictures of dehumidifiers in the hallways. When confronted about being on the property without notice to the insured, Mr. Chisholm apologized and said he was taking pictures for "Keith" because the claim was going to be handled by a new adjuster. The new adjuster, Keith Schmelling, arrived at the insured location on July 18, 2022, Mr. Schmelling questioned the involvement of ART and the remediation/mitigation activities that were ongoing to stabilize the property. Keith Schmelling stated that ART should immediately stop activity and advised that ART was not authorized under the policy to perform the ongoing mitigation services. Keith Schmelling then denied that Stuart Chisholm had authority to order the remediation activities in the first place.

34. The invoice for services performed by ART to stabilize the insured building and to mitigate against further damage has never been paid by the defendants. Neither EM nor

the defendants ever replaced ART with a different vendor or took any action to facilitate mitigation after stating that the insured's vendor should stop mitigation work previously ordered by defendants.

35. On July 21, 2022, NARS sent a reservation of rights ("ROR") letter to the plaintiffs informing the insured of the defendants' ROR during the claim investigation and advising the insured that JS Held was retained to represent the defendants in the investigation in addition to EM. Attached hereto as Exhibit "C" is a copy of the ROR letter.

36. Upon information and belief, the defendants routinely engage both EM and JS Held on large loss claims.

37. On August 24, 2022, JS Held issued a report confirming that the insured's loss was not due to discharge from the sprinkler heads but rather resulted from the hole in the pipe above the second floor ceiling. However, the JS Held engineer incorrectly stated that the hole in the fire suppression system pipe, "...was caused by long term operational corrosion and not the result of a single event or peril." The engineer also documented a call he made to the service company for the insured's fire suppression system. The engineer stated that the service manager allegedly stated that the pipes were old and that the leak was due to corrosion.

38. Upon information and belief, the service manager for Southeastern Automatic Sprinkler denies that he made a statement to anyone that the pipe leak was due to corrosion.

39. The following day, on August 25, 2022, NARS sent a second ROR letter rejecting the insured's proof of loss and demanded "detailed invoices for repair from the 2018 claim." Upon information and belief, the defendants believed that a prior loss claim with a different carrier in 2018, to a different building on the insured property was somehow relevant to the loss claim of July 3, 2022.

40. The plaintiff spent months attempting to gather invoices from the old, unrelated claim in order to demonstrate to the defendants that the repairs in 2018 to the fire suppression system in another area of the property were completed in full.

41. The defendants hired counsel. On September 13, 2022, the attorney retained by ASIC invoked the insurance policy at issue to demand that Rasik and Bubba Bradshaw, "...submit to Examinations Under Oath concerning a claim for reported water damage which was reported to have occurred on July 3, 2022." A copy of the notice of examination under oath, demand for proof of loss and request for documents (including 28 topics of document production) is attached hereto as Exhibit "B".

42. The insured and Mr. Bradshaw submitted to the examinations under oath on December 2, 2021 during which they were each questioned for hours by the attorney for the defendants about the unrelated 2018 claim with a different carrier, the scope of the loss from the July 3, 2022 claim, maintenance on the fire suppression system and loss of income. During the EUO's, the attorney for the defendants performed a site inspection and viewed the visible damage to the rooms and hallways.

11

43. On January 11, 2023, JS Held performed another inspection for the defendants at the insured property. Upon information and belief, the defendants did not believe the small hole in the fire suppression sprinkler system pipe could deliver abrupt liquid overflow damage in the amount demonstrated at the property. Accordingly, the engineer for JS Held performed a simulated loss event and concluded, by report of February 17, 2023, that the leak would have likely discharged between 85 and 87 gallons of water per hour.

44. On or about March 6, 2023, the defendants advised the plaintiff that the investigation was ongoing as was the ROR. The defendants nevertheless agreed to tender $86,641.53 of the blanket coverage for the abrupt liquid overflow damage. This is despite the reality that the defendants' own vendor, EM, estimated that the damage to the building would be more than $650,000.00.

45. The insured property remains unrepaired. Rasik is unable to make the necessary repairs and is facing bankruptcy. The plaintiffs have borrowed money in an attempt to keep the Econolodge out of bankruptcy during the past 10 months because the largest portion of rooms cannot be rented because of the damage from the loss. The unconditional tender of some benefits under the policy went immediately to service debt incurred as a result of the insured's inability to rent rooms due to the loss.

46. Upon information and belief, the defendants' most recent rationale for not paying the entire claim is the reliance upon the (incorrect) conclusion of the JS Held engineer that the water discharge only lasted 30 minutes and, therefore, could not have caused the

scope of loss observed at the property. It is unknown what explanation the engineer has for the scope of loss that is, in fact, present and has been demonstrated at the property since July 3, 2022.

47. Upon information and belief, the defendants have in their possession, and have had in their possession since July of 2022, moisture meter readings obtained by the representatives of the defendants informing them exactly what parts of the insured property were tested for moisture and exactly how much moisture was recorded following the loss of July 3, 2022.

## CAUSES OF ACTION

### I. Breach of Contract and Breach of Duties of Good Faith and Fair Dealing

48. Plaintiffs incorporate the averments contained in Paragraphs 1 through 47 above.

49. At all relevant times, defendant ASIC owed the plaintiff the contractual duty to promptly pay benefits owed under the insurance policy contract. In addition, the defendants owed the plaintiff affirmative duties of good faith and fair dealing implied at law in every Mississippi contract. Finally, defendants owed the plaintiffs a duty perform a reasonably prompt and adequate claim investigation.

50. Defendants breached the contract and breached affirmative duties owed to the insured by failing to pay the claim as agreed in the policy despite the obvious and clear nature of the abrupt liquid overflow damage which was a covered loss under the policy. Defendants

breached affirmative duties of good faith and fair dealing in the following ways;

- a) telling the insured he had a duty to mitigate and simultaneously telling the insured that he was not required to use any specific company;

- b) retaining vendors known to work with the defendants in order to obtain favorable opinions to lessen or avoid the claim exposure;

- c) providing a representative with actual and apparent authority that ordered the insured to take initial mitigation steps to throw away mattresses, tear out drywall and flooring that showed moisture damage and to throw away other items damaged from the loss;

- d) ordering the mitigation provider contracted by the insured, ART, to stop mediation work and leave the insured premises;

- e) failing to pay the invoice of ART for mitigation services performed to try and stabilize the building;

- f) failing to provide a different vendor or fund any mitigation effort despite actual knowledge of ongoing mold and mildew growth due to the water exposure;

- g) utilizing stall tactics such as investigation of an unrelated 2018 claim to a different building to delay claim payment and demand documentation from the insured;

- h) using the policy provisions against the insured to demand examinations

under oath and outrageous document productions while simultaneously refusing to pay the claim;

i) failing to perform a reasonable and prompt claim investigation;

j) utilizing selected vendors to create excuses to lessen or avoid claim exposure;

k) using field adjusters to sneak onto the insured premises without notice or permission in an attempt to locate a basis to deny or delay the claim payment;

l) ignoring sworn testimony regarding the time line of the loss event in order to claim a smaller scope of loss;

m) delaying payment on the insured's claim despite actual knowledge of economic and other harm being suffered;

n) delaying payment on the insured's claim without a legitimate or arguable basis;

o) in other ways breached the contract and breached the affirmative duties owed to the insured.

51. As a direct and proximate result of the defendants breaches of the contract and breaches of the affirmative duties of good faith and fair dealing and duty to perform a reasonable and prompt claim investigation the defendants has suffered damages as described below.

## II. Civil Conspiracy and Collusion

52. Plaintiff incorporates the averments contained in Paragraphs 1 through 51 above.

53. The defendants retained Engle Martin and JS Held as vendors to perform the claim investigation services for the defendants. These vendors were known to the defendants and prior business relationships existed in which billable time would be submitted to the defendants in exchange for payment. These vendors were used by the defendants to obtain representation at the insured property and to obtain opinions favorable to the defendants. Rather than perform a reasonable or prompt investigation, the defendants hired vendors that would communicate with the defendants on the claim and indulge every possible suspicion or allegation of the defendants. These vendors communicated, conspired and colluded directly with the defendants to remove ART from the insured property, to deny that authorization for destruction of mattresses and other property was ever given, to allege long-term corrosion as a possible defense under the policy, to re-create the pipe leak but then misrepresent the amount of water that would be discharged and in other ways agreed to wrongfully perform a claim investigation to the direct harm of the plaintiff. Upon information and belief, these vendors communicated directly with the defendants and their agents by way of telephone, mail, email and text communications to discuss their suspicions on the claim and collude on ways to investigate the claim to reach a result favorable to the defendants and unfavorable to the insured. These acts by the defendants through the use of

their vendors represented a wrongful civil conspiracy designed to harm, and which did harm, the plaintiffs. At all relevant times, the vendors were the agents of the defendants selected by them and given actual and apparent authority to act for the defendants. As such, the intentional and or negligent conduct of the vendors is imputed to the defendants who owed the plaintiff duties under the contract and under Mississippi law.

## DAMAGES

54. The plaintiffs allege that the acts and omissions of defendants have been the direct and proximate cause of damage as follows:

   a. Economic harm, including damage to credit, reputation and out-of-pocket payments and loans;

   b. Economic harm from defendants' failure to pay policy benefits and failure to pay policy benefits in a timely manner;

   c. Emotional distress suffered by Rasik Patel;

   d. Anxiety, worry and mental pain and suffering of Rasik Patel;

   e. Attorney fees and costs;

   f. other, middle-tier, *Veasley* extra-contractual damages;

   g. Pre- and post-judgment interest;

   h. loss of business reputation and associated loss of income;

   i. Moreover, the acts and omissions of defendants have been of such outrageous conduct and character and so intentional and malevolent as to warrant the

imposition of punitive damages to deter defendants and others from similar conduct in the future and as otherwise consistent with Mississippi law.

## AD DAMNUM

55. Plaintiff seeks judgment from defendants in an amount exceeding $75,000.00, exclusive of attorney fees, interest or costs sufficient to compensate the plaintiffs for actual economic and non-economic losses as well as an award of punitive damages levied against defendants and contemplating the net worth of the defendants consistent with Mississippi law.

RESPECTFULLY SUBMITTED,

**SHREE HARIS, INC. d/b/a ECONOLODGE, Plaintiff**

By: */s/Steven H. Funderburg*
Steven H. Funderburg (MSB#9959)

OF COUNSEL:

FUNDERBURG, SESSUMS &PETERSON, PLLC
Post Office Box 13960
Jackson, MS 39236-3960
Telephone:   601-355-5200
Facsimile:   601-355-5400
Email:   sfunderburg@fsplawfirm.com
***ATTORNEYS FOR PLAINTIFF***